UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

**LEON COVINGTON**            **PLAINTIFF**

**vs.**            **NO. 3:18-CV-832-CRS**

**DOW CHEMICALS**            **DEFENDANT**

**MEMORANDUM OPINION**

This matter is before the Court on Defendant Dow Chemicals' ("Dow's") motion for summary judgment under Federal Rule of Civil Procedure 56. DN 42. Plaintiff Leon Covington ("Covington") filed a response, and Defendant replied. DN 45; DN 47. This matter is now ripe for adjudication. For the reasons stated below, Defendant's motion will be granted by separate order.

**I. BACKGROUND**

This case arises out of alleged discrimination and retaliation against Plaintiff on the basis of his race while he was an employee of Defendant.[1] DN 1-2. Plaintiff claims defendant discriminated against him in failing to promote him to an SB6 operator position and in terminating him. *Id.* at 4–5. In addition, Plaintiff claims that his termination was in retaliation for filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and for lodging various other complaints of discrimination with Dow's Human Resources and Ethics Departments. *Id.* at 5. The uncontested facts, drawn primarily from Plaintiff's deposition and attached exhibits, DN 42-2, are as follows.

---

[1] Defendant states: "Covington misnamed Dow as 'Dow Chemicals' in the Complaint. As raised in its Affirmative Defense No. 2, The Dow Chemical Company was not Covington's employer. Rather, Covington was employed by Rohm and Haas Chemicals, LLC, a subsidiary of Dow." DN 42-1 at 4 n.1. Defendant refers to Dow as Covington's employer in its brief "for ease of reference." *Id.* Therefore, the Court will do the same.

1

### A. Collective Bargaining Agreement and the Louisville Site Selection Process

Covington, who is African American, was hired at Dow in April 2012 as a Site Logistics Operator. DN 42-1 at 4. After his probation period ended in early 2013, he became a member of the United Steel workers Local Union ("Union"), and the terms of his employment were governed by a collective bargaining agreement ("CBA") between Dow and the Union. DN 42-2 at 5–6. Under the CBA, union employees were organized into different skill blocks, "with each higher skill block involving greater responsibility and correlated higher pay." DN 42-1 at 6; DN 42-2 at 19–21. The lower level skill blocks "were responsible for packaging finished chemical product, bulk loading and shipping, and raw material unloading." DN 42-1 at 6. The highest skill block, SB6, "was held by the operators who electronically ran the production chemical processes." *Id.*

Under the CBA, the selection of new SB6 operators was controlled by the "Louisville Site Selection Process" ("Site Selection Process" or "selection policy"). DN 42-2 at 130–35, 238–40. This protocol was in effect throughout Covington's employment. *Id.* at 132. The Site Selection Process states: "This procedure is used by Site Leadership and Operations to select the best qualified candidate from those which apply for any open SB6 position within Louisville Site Operations." DN 42-2 at 245. After an initial period in which open SB6 positions are available only to current SB6 operators, the selection policy provides that the lower skill block employees be notified of the open positions via an email from a Dow "leader." *Id.* at 136, 213–14, 245. To apply, employees were instructed to reply to the email and express their interest in the position. *Id.* at 136, 245. Once the application period ended, the leader would work with an "interview team" consisting of "a minimum of (2) SB6 operators and (2) influential leaders" who were tasked with making a recommendation to the leader for which candidate should fill the vacancy. *Id.* at 245. Pertinently, the Site Selection Process provides that "[c]andidates will be automatically

disqualified" from consideration for SB6 positions for (1) "Step 2 (or above) in the progressive discipline process within the previous 12 months," or (2) "Lowest performance ranking for the previous review cycle." *Id.* Plaintiff acknowledges in his deposition that Dow was "bound to follow [the] site selection process by virtue of the [CBA]" in selecting SB6 operators. *Id.* at 143.

### B. Covington's Disciplinary History and Performance Reviews

The various steps in the progressive discipline process mentioned in the Site Selection Process are as follows: Step 1/Verbal Warning; Step 2/Written Warning; Step 3/Written Warning with Suspension; and Step 4/Termination. *Id.* at 42. Covington's supervisors discussed performance issues with him at various times throughout his employment, which on several occasions resulted in disciplinary actions that went onto his record. In a document dated November 1, 2013, Covington received a verbal warning for failing to complete a monthly "table top drill" (a computer-based safety exercise) on time. *Id.* at 37–40, 266.[2] Covington's entire shift was disciplined for the overdue training activity because everyone had equal responsibility to see that the task was completed, according to Plaintiff. *Id.* at 39–40. Covington admits that he understood that completing "compliance tasks" was a requirement of his employment at Dow. *Id.* at 40. Consistent with Dow's disciplinary policy, the letter notifying Plaintiff of the verbal warning stated that letter would remain in his file for three years and that any further discipline would result in the letter remaining in his file for three years from the date of the last disciplinary action. *Id.* at 48, 266. This verbal warning placed Covington at Step 1 in the progressive discipline process. *Id.* at 42, 262.

Next, according to the record, Covington received an email in November 2014 notifying him of overdue training courses. *Id.* at 44. He became overdue on completing training modules

---

[2] Covington states in his deposition that he did not receive the document notifying him of the disciplinary action until sometime in 2014. DN 42-2 at 39.

again in June 2015. *Id.* at 44–45. On July 24, 2015, Covington was issued a written warning for not completing a total of ten training modules on time over the course of May and June 2015. *Id.* at 47, 246.[3] The written warning letter states that it, as well as the 2013 verbal warning letter, would remain in his file for three years. *Id.* at 246. As of this written warning, Covington progressed to Step 2 in Dow's progressive discipline process. *Id.* at 42, 262.

On March 4, 2016, Covington was issued a written warning with a three-day suspension for an incident that occurred on February 29, 2016. *Id.* at 87–88, 262. On that day, Plaintiff entered a guarded stretch wrapper area without following the proper safety protocols. *Id.* at 262. Dow had "Life Critical Standards" in place for performing certain tasks that are inherently dangerous to the employee. *Id.* at 31–32. Covington was trained in these standards and acknowledges that he entered the guarded area "without using the approved energy control operating procedure." *Id.* at 31–32, 90. When Plaintiff was issued this written warning with three-day suspension, he progressed to Step 3 in the progressive discipline process. *Id.* at 42, 262.

Another incident that occurred on August 25, 2017 led to further disciplinary measures. *Id.* at 262. Covington left a hose running, which caused water to get "into the rework system which plugged the product hopper, created off-grade material, and damaged the rework rotary valve motor." *Id.* Although Plaintiff was already at Step 3, his supervisor only added the incident as an addendum to his previous written warning, extending the length of time the letter would be kept in Covington's file to three years from the date of the incident. *Id.* at 95, 262. On September 11, 2017, during the meeting in which Plaintiff received the amended disciplinary letter, Covington "expressed gratitude" that the incident only resulted in an addendum to his previous written warning and that no further action was taken. *Id.* at 98–99. In that same meeting, Covington

---

[3] Covington claims he did not receive the document notifying him of the disciplinary action until October 2015. *Id.* at 47.

remembers his supervisor Troy McDonald ("McDonald") expressing that he still wanted Plaintiff on his team and that he "thought that [Covington] could be an SB6 someday." *Id.* at 99.

Finally, Covington received low scores on his annual performance reviews for the years 2016 and 2017. *Id.* at 59–63, 260–61. For his 2016 performance review, McDonald wrote:

> Leon needs to follow Life Critical Standards at all times per the written warning he received in 2016. He needs to increase his safety matters and walkabouts. He needs to improve his attendance. Leon needs to give explanations in Logbook for the hopper being full and reply to inquires around downtime. . . . He needs to make sure paperwork is complete and accurate everytime. Leon could be more thorough and allow for open discussion during the morning meeting. He can look for opportunities for other work when not bagging.

*Id.* at 260. The review concludes by ranking Covington's overall performance as "Less than Job Expectations," which is the lowest performance ranking. *Id.* Covington testified that he received this review sometime in 2017, but could not recall the exact date. *Id.* at 61.

In his 2017 performance review, McDonald wrote:

> Leon needs to operate mistake free. Leon plugged and damaged the rework system by getting water in it. . . . Leon failed to take action and properly document OOS results. He needs to log material into the scrap area every time. . . . He needs to take ownership of his actions.

*Id.* at 261. As with the previous performance review, it concludes by ranking Covington's overall performance as "Less than Job Expectations." *Id.* Plaintiff testified that he received this review on March 20, 2018. *Id.* at 62.

### C. Open SB6 Positions and Covington's Applications for Promotion

During Covington's employment at Dow, he claims to have primarily expressed interest in SB6 operator position's in the "Dryers" facility, the area of the plant in which he had always worked. *Id.* at 138. The only exception is that he claims to have expressed interest in one SB6 position in the "KVK" facility. *Id.* In his deposition, Covington claims to have applied three to four times for open SB6 positions in total. *Id.* However, Plaintiff states that he does not recall the

exact dates or even the years in which he applied for promotions. *Id.* at 139–40, 163. The only documents submitted by either party regarding open SB6 positions or Plaintiff's applications for promotion are contained in Exhibit 34 to Plaintiff's deposition, which was attached to Defendant's motion. *Id.* at 267–83. This exhibit shows a series of emails notifying employees of open SB6 positions as well as emails announcing when those positions had been filled. *Id.* at 267–83. Defendant claims that, during Covington's employment, SB6 positions in the Dryers facility were awarded on six different occasions: August 14, 2015; April 21, 2016; May 26, 2017; September 7, 2017; November 20, 2017; and January 12, 2018. DN 42-1 at 19. Exhibit 34 also shows that SB6 positions were awarded for the KVK facility August 14, 2015 and June 13, 2017. DN 42-2 at 269, 277. The exhibit contains only two emails from Plaintiff expressing interest in open SB6 positions. *Id.* at 267, 278. The first is dated June 5, 2015, and the second is dated July 05, 2017. *Id.*

### D. Covington's Termination

As Plaintiff admits in his deposition, packaging products in accordance with customer specifications was "the most significant part of his job." *Id.* at 10. On May 9, 2018, Covington was packaging product "for a customer that specified the blue loop bag—with the blue loop representing a particular type of bottom to the bag that affected how the customer would unload that [product]." DN 42-1 at 21. The specification for the particular bag type was noted in the schedule and product transition checklist, both of which Plaintiff admits he was responsible for looking at before packaging the product. DN 42-2 at 111–13. However, Covington did not use the blue loop bag as specified, using instead the standard white loop super sack. *Id.* at 120. He then signed off on the checklist as using the incorrect bag type even though it clearly noted that the blue loop bags were to be used. *Id.* Plaintiff admitted to McDonald and to Dan Neumann

6

("Neumann") of Dow's HR department that he made the mistake and "took full responsibility." *Id.* at 122–24. Citing McDonald's affidavit, which was attached as on exhibit to its motion for summary judgment, Defendant claims that Covington's packaging error resulted in "costly re-work and re-packaging of thousands of pounds of the K-400 product, which involved significant labor time/costs; significant loss of the use of equipment to do other packaging; the loss of the white bags that had been incorrectly used; and the loss of some product." DN 42-1 at 22; DN 42-3 at 5–6.

On May 18, 2018, Covington "was terminated for performance, as his packaging error on May 9, 2018 placed him at Step 4 of the progressive discipline process." DN 42-1 at 22; DN 42-3 at 6. Covington's union filed a grievance over the termination. DN 42-2 at 125. During this process, the Union did not challenge Covington's packaging error itself, but instead proposed alternative resolutions other than termination. *Id.* at 127. The Union eventually dropped the grievance after not being able to reach a settlement with Dow. *Id.* at 129.

### E. Covington's EEOC charge and Internal Complaints

On October 25, 2017, Covington filed a charge of race discrimination against Dow with the EEOC. *Id.* at 166. Dow received the complaint from the EEOC on November 6, 2017. *Id.* at 348. The EEOC charge complains of being passed over for promotion "several times in favor of White, less experienced coworkers, most recently in June 2017 and in September 2017," and that "[Covington's] manager Troy McDonald holds [him] to a higher standard than White coworkers and has written [him] up for things that others are not written up for, most recently on or about August 25, 2017." *Id.* at 352. It goes on to state that "the reason given for the writeup was that I caused the product hopper to be plugged. The reason given for not promoting me was that I had a writeup in my file." *Id.* The charge also indicates that the earliest point in time that discrimination

7

took place was March 01, 2017. *Id.* The EEOC dismissed Covington's discrimination charge on February 16, 2018, stating that it was "unable to conclude that the information obtained establishes violations of the statutes," and that it did not "believe that additional investigation [would] result in our finding a violation." *Id.* at 354–56. Covington states that he never informed McDonald or anyone else at Dow that he had filed an EEOC charge, although McDonald did learn of it from Neumann "[a]t some point in the latter part of 2017," according to his affidavit. *Id.* at 172–73; DN 42-3 at 6.

In addition to Covington's EEOC charge, he also lodged several internal complaints alleging discrimination in the workplace. The first was an email to Mike Dizer ("Dizer") of Dow's HR department at some point in 2017, although the exact date is unclear. DN 42-2 at 174. In his letter to Dizer, Covington complains of "unfair promoting practices at the Louisville site" and "unfair write ups that other employees don't get written up for," stating that "favoritism, nepotism and racism, have played a role in the decisions of the management." *Id.* at 360. As with the EEOC charge, Plaintiff never informed McDonald of the complaint he made to Dizer, and McDonald never mentioned it to Covington. *Id.* at 178–79.

Then, in December 2017, Plaintiff contacted Karen Carter ("Carter"), who was the Chief Human Resources and Inclusion Officer for Dow, communicating the same concerns that he had brought up with Dizer. *Id.* at 183–84. Carter recommended that he contact Kara Gordon ("Gordon"), the Chief Ethics Compliance Officer for Dow. *Id.* at 342. On January 15, 2018, Covington forwarded to Gordon a letter he had sent to Carter that outlined his complaints regarding discrimination. *Id.* at 187–88. On July 6, 2018, Dow's Office of Ethics and Compliance sent Covington a letter explaining that the office had conducted an investigation and found no evidence to substantiate his claims. *Id.* at 190, 347. Plaintiff states that he never discussed this complaint

with McDonald. *Id.* at 190. McDonald states in his affidavit that he only learned of Covington's communications with Dizer, Carter, and Gordon during the course of this litigation. DN 42-3 at 6.

### F. Procedural History

Covington filed this action in Kentucky state court on or around November 16, 2018. DN 1-3 at 4. The complaint alleges violations of Kentucky state law. DN 1-2 at 4–5. Plaintiff claims he was denied promotion because of his race and was terminated because of his race in violation of the Kentucky Civil Rights Act ("KCRA"). DN 1-2 at 4–5; Ky. Rev. Stat. Ann. § 344.040. Plaintiff also alleges that his termination was in retaliation for the various complaints he made about race discrimination in violation of the KCRA. DN 1-2 at 5; Ky. Rev. Stat. Ann. § 344.280. Defendant's receipt of service of process is dated November 27, 2018. DN 1-3 at 2. Defendant removed the action to federal court on December 17, 2018 on the grounds of diversity jurisdiction. DN 1-1. After discovery, Defendant filed the present motion for summary judgment. DN 42.

## II. LEGAL STANDARD

A party moving for summary judgment must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Such an absence may be shown "by demonstrating that the nonmoving party lacks evidence to support an essential element of its case." *Ford v. GMC*, 305 F.3d 545, 551 (6th Cir. 2002). "In response, the nonmoving party must present 'significant probative evidence' to show that 'there is [more than] some metaphysical doubt as to the material facts.' *Id.* (quoting *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993) (alteration in the original)). "[T]he party opposing summary judgment cannot rest on its pleadings

or merely reassert its previous allegations." *McGinnis v. United States Air Force*, 266 F. Supp. 2d 748, 758 (S.D. Ohio 2003). A genuine issue for trial exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986); *see also Mich. Protection and Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994) ("[The nonmoving party] must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the [nonmoving party].") Additionally, the Court must draw all factual inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. ANALYSIS

Defendant argues in its motion that it should be granted summary judgment on all of Plaintiff's claims. DN 42. However, as an initial matter, the Court will address Defendant's argument in its reply that Plaintiff abandoned his discrimination claim with respect to his termination by failing to respond to Defendant's arguments. DN 47 at 6. The Sixth Circuit has stated, "This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013); *see also Alexander v. Carter*, 733 F. App'x 256, 261 (6th Cir. 2018) ("When a plaintiff 'fails to address [a claim] in response to a motion for summary judgment,' the claim is deemed waived. . . . Where claims are so waived, district courts in this Circuit grant summary judgment as a matter of course." (internal citations omitted) (alteration in original)). For example, in *Brown v. VHS of Michigan, Inc.*, the plaintiff asserted several claims, including discrimination, harassment, and retaliation, among others. *Id.* at 370. However, in her response to the defendant's comprehensive motion for

summary judgment, she only addressed her retaliation claim. *Id.* at 372. The Sixth Circuit affirmed the district court's holding that the plaintiff had abandoned all claims except for the retaliation claim by failing to fully respond to the defendant's motion. *Id.*

In this case, Defendant submitted a comprehensive motion for summary judgment, which included a four-page argument as to why it should be granted summary judgment on Plaintiff's discrimination claim with respect to Covington's termination. DN 42-1 at 30–34. Plaintiff's response addresses his discrimination claim with respect to not being promoted and his retaliation claim. DN 45 at 6–13. However, Plaintiff does not mention his discrimination claim with respect to his termination. *See id.* His arguments regarding promotion are insufficient to save the other discrimination claim from abandonment. Although the legal framework applicable to each discrimination claim would be similar, each claim hinges on distinct legal and factual analyses, which Plaintiff did not address in his response. Therefore, Covington's discrimination claim with respect to his termination is abandoned. As a result, the Court need only address Defendant's motion with respect to Plaintiff's failure to promote claim and retaliation claim.

### A. Discrimination for Failure to Promote

The KCRA provides that it is unlawful "for an employer . . . to discharge any individual, or otherwise to discriminate against an individual . . . because of the individual's race." Ky. Rev. Stat. Ann. § 344.040(1)(a). Because "the provisions of the KCRA are virtually identical to those of [Title VII of the Federal Civil Rights Act]," actions involving claims of discrimination and retaliation under the KCRA are to be analyzed consistent with federal law. *Jefferson Cty. v. Zaring*, 91 S.W.3d 583, 586 (Ky. 2002); *Brooks v. Lexington-Fayette Urban Cty. Hous. Auth.*, 132 S.W.3d 790, 801-02 (Ky. 2004). Discrimination claims under the KCRA or Title VII may be proven with either direct or indirect evidence. *White v. Baxter Healthcare Corp.*, 533 F.3d 381,

11

391 (6th Cir. 2008). Examples of direct evidence include "a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). Plaintiff in this case has not offered any direct evidence of discrimination. In the absence of direct evidence, the *McDonnell Douglas* burden shifting framework applies. *Brooks*, 132 S.W.3d at 795 (Ky. 2004). First, Plaintiff must establish a prima facie case of discrimination with respect to Dow's failure to promote him. *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006). If Plaintiff establishes a prima facie case of discrimination "the burden then shifts to [Defendant] to articulate some legitimate, nondiscriminatory reason for the [Defendant's] action." *Id.* at 719–20. To do so, "the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 257 (1981). If Defendant meets this burden of production, then the burden shifts back to Plaintiff to "prove that the legitimate reasons offered by [Defendant] were in fact a pretext for discrimination." *Grizzell*, 461 F.3d at 720. "Although the burdens of production shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *White*, 533 F.3d at 392.

To establish a prima facie case of discrimination with respect to promotion denials, Plaintiff must show: "(1) [he is a member] of a protected class; (2) [he] applied and [was] qualified for promotion; (3) [he was] considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions." *Grizzell*, 461 F.3d at 719. Defendant argues that Plaintiff cannot satisfy the second element because he was automatically disqualified from promotion to SB6 operator due to being at Step 2

or higher in the progressive discipline process as of July 2015 and due to his lowest performance ranking in his 2016 and 2017 performance reviews. DN 42-1 at 26–27. "At the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job." *Wexler v. White's Fine Furniture*, 317 F.3d 564, 575 (6th Cir. 2003) (emphasis in original). The effect of Covington's disciplinary status and performance rankings on his eligibility for promotion under the Louisville Site Selection Process is precisely the type of information this Court may use when considering Plaintiff's qualifications at the prima facie stage, as this pertains to the "minimum objective criteria required for employment in the relevant field." *Id.* at 576. According to the materials submitted by Defendant, the earliest open SB6 position in the Dryers area during Covington's employment was awarded in August 2015. DN 42-1 at 16; DN 42-2 at 269. The two known open SB6 position in the KVK facility according to the record were awarded in August 2015 and June 2017. DN 42-2 at 269, 277. In his response, Plaintiff does not dispute the dates of SB6 openings provided by Defendant nor that he was at Step 2 in the progressive disciplinary process starting July 24, 2015. *See* DN 45. Thus, Plaintiff would have been automatically disqualified from promotion to an SB6 position at all relevant times under the Louisville Site Selection Process according to the record.

While acknowledging that Covington had "a disciplinary history while working at Dow Chemical," Plaintiff notes that "all of his evaluations were not below expectations, or at the lowest level." DN 45 at 2. Plaintiff claims that his performance history means he "would have been eligible for promotion from 2014 to 2016 according to the operation selection process." *Id.* Plaintiff does not support this assertion with citations to the record other than to his 2014 performance review, which states that he was meeting job expectations at that time. DN 50 at 3. Defendant does not dispute that Plaintiff had satisfactory performance reviews during this period,

13

arguing only that Plaintiff's 2016 and 2017 performance reviews were pertinent to his being disqualified from promotion. DN 47 at 9. Defendant correctly points out in its reply that Plaintiff does not address the consequences of his disciplinary history under the Site Selection Process, which, when considered, contradicts Plaintiff's assertion that he was qualified during the times at which SB6 operator positions were available according to the record. *Id.*

Plaintiff mentions later in his response that Defendant's argument does not account for the period before Covington reached Step 2 and, thus, was not automatically disqualified. DN 45 at 9. However, Plaintiff has not shown that he applied for any promotions during the period before July 24, 2015. *See* DN 45. Although he claims to have applied in 2014, Plaintiff may not rely on factual assertions from his complaint at the summary judgment stage. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." (internal quotation marks omitted)). Furthermore, a plaintiff must be able to prove that he actually applied for a promotion in order to establish a prima facie case of discrimination. *Wanger v. G.A. Gray Co.*, 872 F.2d 142, 145-47 (6th Cir. 1989) ("[W]e hold that the district court properly concluded that Wanger failed to state an ADEA claim because he failed to establish that he applied for the available position."); *Nguyen*, 229 F.3d at 564 ("For Nguyen to establish a prima facie case with respect to this position, he needed to demonstrate that he applied for the position.").[4] Therefore, since Plaintiff was disqualified for promotion when each SB6 opening contained in the record was awarded and he has not shown that he applied for any promotions during a time in

---

[4] There are certain exceptions to this rule that do not apply here, such as when there is evidence that the employer's discriminatory practices create an "atmosphere of futility" such that applying would be futile or the employer has a practice of promoting employee's without asking for applications. *Wanger v. G.A. Gray Co.*, 872 F.2d 142, 145-47 (6th Cir. 1989).

which he was not disqualified from receiving a promotion, he has failed to establish a prima facie case of discrimination.

Defendant argues that even if Plaintiff could establish a prima facie case of discrimination, he cannot show that Defendant's stated reason for not promoting him is a pretext for discrimination. DN 42-1 at 230. The Court agrees. "A plaintiff establishes pretext by showing that the reason offered by the defendant: (1) has no basis in fact; (2) did not actually motivate the decision not to promote, or (3) was insufficient to warrant the decision not to promote." *Grizzell*, 461 F.3d at 720. Plaintiff has not put forward evidence of any other employee who was promoted to SB6 operator despite being at Step 2 or higher in the progressive disciplinary process or despite having a lowest performance ranking. *See* DN 45. Furthermore, Plaintiff does not argue in his response, much less put forward evidence, that the disciplinary actions that led to his ineligibility for promotion were themselves discriminatory or in any way irregular. *See* DN 45. Except for one employee who received accommodations for having to be off from work, Plaintiff testified that he could not recall any employee "who was overdue on his or her training and did not receive discipline." DN 42-2 at 210–11. In short, the record is devoid of any evidence suggesting that Plaintiff was discriminated against because of his race with regard to promotion opportunities.

The only evidence Plaintiff puts forward to prove his discrimination claim is that three white employees, who were hired one to two years after Plaintiff, were promoted to SB6 positions during the period of 2014-2015. DN 45 at 9–11. Plaintiff argues that he was more qualified than these white employees, but still they were promoted ahead of him. *Id.* at 9. Putting aside the fact that Covington has not shown that he actually applied for a promotion during this period, it is true that "consciously choosing a less-qualified candidate may constitute evidence of pretext." *Grizzell*, 461 F.3d at 722. However, "[w]hether qualifications evidence will be sufficient to raise

15

a question of fact as to pretext will depend on whether a plaintiff presents other evidence of discrimination." *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 626 (6th Cir. 2006). Specifically, when "there is little or no other probative evidence of discrimination, to survive summary judgment the rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former." *Id.* at 627. As already discussed, the record contains no other "probative evidence of discrimination." *Id.* Other than Plaintiff having worked at Dow one to two years longer than the other employees to which he cites, he has put forward no evidence of being more qualified such that no reasonable employer would have chosen these employees over him. *See* DN 45. Therefore, Covington has not shown that Defendant's reason for not promoting him was merely pretextual and has not submitted any evidence on which a reasonable jury could conclude that Defendant's conduct was racially motivated. Accordingly, Defendant's motion for summary judgment with respect to Plaintiff's discrimination claim for failure to promote will be granted.

### B. Retaliation

The KCRA provides that it is unlawful to "retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge [or] filed a complaint." Ky. Rev. Stat. Ann. § 344.280(1). As with discrimination claims, the *McDonnell Douglas* framework applies to retaliation claims under the KCRA that rely on indirect evidence. *Ky. Dep't of Corr. v. McCullough*, 123 S.W.3d 130, 134 (Ky. 2003). To establish a prima facie case of retaliation, a plaintiff must prove: "(1) he engaged in activity protected by [KCRA]; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Ford v. GMC*,

16

305 F.3d 545, 552–53 (6th Cir. 2002). Plaintiff claims that his termination was in retaliation for his EEOC charge and various internal complaints. *See* DN 1-2 at 5. Defendant argues that it should be granted summary judgment on Covington's retaliation claim because he cannot satisfy the fourth element of his prima facie case regarding causal connection. DN 42-1 at 36–37.

To satisfy the causation element, a plaintiff must show that retaliatory motive was a "but-for cause" of the adverse action and not that it was necessarily the primary cause. *Asbury Univ. v. Powell*, 486 S.W.3d 246, 259 (Ky. 2016). This is accomplished by providing "evidence sufficient to permit the factfinder to conclude that unlawful retaliatory motive was so integral to the adverse action that more likely than not the action would not have been taken had the employee not engaged in protected activity." *Id.* at 260. Plaintiff's only argument in support of his retaliation claim is that "[t]he temporal proximity of Mr. Covington's protected activity and termination creates an inference of retaliation." DN 45 13. There was a six-month period between when Dow received Covington's EEOC complaint and his termination and four months between when Covington filed his complaint with Dow's ethics department and his termination. Although temporal proximity alone without other evidence of retaliation may be sufficient to establish a prima facie case in some cases where the period between the protected activity and the adverse employment action is extremely short, courts have consistently held that temporal proximity alone is insufficient when the span of time is four to six months. *Nguyen*, 229 F.3d at 567 ("[T]here may be circumstances where evidence of temporal proximity alone would be sufficient to support [an inference of retaliation]."); *Cooper v. N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) ("The mere fact that Cooper was discharged four months after filing a discrimination claim is insufficient to support an interference of retaliation."); *Brooks*, 132 S.W.3d at 804 ("[Four months] was too long to create, by itself, an inference of causality."). Thus, in general, temporal proximity by itself

cannot establish a prima facie case of retaliation when "plaintiff's retaliation case [is] otherwise weak, and there [is] substantial evidence supporting the defendant's version of the events." *Nguyen*, 229 F.3d at 567.

Such is the case here. Plaintiff does not offer any further evidence that his termination was in retaliation for engaging in protected activity. The record shows that Plaintiff was already at Step 3 in the progressive discipline process when he made the packaging error that lead to his termination. His Step 3 status had already been extended once by adding an addendum instead of progressing to Step 4. In addition, Plaintiff has not offered evidence to dispute any of these disciplinary measures that lead up to his termination nor to show that any employee made a similar packaging error and was not disciplined or terminated. Defendant has offered evidence that Plaintiff's packaging error was serious enough to warrant disciplinary action, and in Plaintiff's case, given his progressive disciplinary status, termination. Thus, Plaintiff cannot establish a prima facie case of retaliation based on temporal proximity alone. Without further evidence of retaliatory motive, no reasonable jury could find for Plaintiff on this issue. Therefore, Defendant's motion with respect to Plaintiff's retaliation claim will be granted.

## IV. CONCLUSION

For the reasons stated above, Defendant's motion, DN 42, will be granted by separate order.

July 22, 2021



Charles R. Simpson III, Senior Judge
United States District Court